UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH TERRY,

                      Plaintiff,

    -v-

CO JAMES HULSE JR.; CO MATTHEW
BURNS; CO CHAD ESTERBROOK; CO
BRUCE TUCKER; CO ALAN HANSON;
SERGEANT WILLIAM COLE,

                    Defendants.

16-CV-252 (KMK)

OPINION & ORDER

Appearances:

Joseph Terry
Elmira, NY
*Pro Se Plaintiff*

Bradley Gordon Wilson, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

       Plaintiff Joseph Terry ("Plaintiff"), currently an inmate at Elmira Correctional Facility

Facility ("Elmira"), brings this pro se action under 42 U.S.C. § 1983 against Defendants

Correction Officer ("CO") James Hulse Jr. ("Hulse"), CO Matthews Burns ("Burns"), CO Chad

Estabrook ("Estabrook"), CO Bruce Tucker ("Tucker"), CO Alan Hanson ("Hanson"), and

Sergeant William Cole ("Cole," and collectively with Hulse, Burns, Estabrook, Tucker, and

Hanson, "Defendants"). (*See* Compl. (Dkt. No. 2).)[1] Plaintiff alleges that Defendants violated

---

[1] Plaintiff's Complaint also named New York State Department of Corrections and
Community Supervision ("DOCCS") as a Defendant. In response to an Order to Show Cause as
to why the claims against DOCCS should not be dismissed under the Eleventh Amendment,
(Dkt. No. 8), Plaintiff consented to the dismissal of DOCCS as a Defendant, (Dkt. No. 11).

his constitutional rights by assaulting him and then retaliating against him after he reported the assault.  (*Id.* ¶¶ 30–47.)  Before the Court is Defendants' Motion for Summary Judgment (the "Motion").  (Notice of Motion (Dkt. No. 66).)  For the reasons that follow, Defendants' Motion is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are taken from Defendants' statement pursuant to Local Civil Rule 56.1, (Defs.' Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 68)), the exhibits submitted by Defendants, (Decl. of Matthew Burns in Supp. of Mot. for Summ. J. ("Burns Decl.") (Dkt. No. 69); Decl. of William Cole in Supp. of Mot. for Summ. J. ("Cole Decl.") (Dkt. No. 70); Decl. of Chad Estabrook in Supp. of Mot. for Summ. J. ("Estabrook Decl.") (Dkt. No. 71); Decl. of Alan Hanson in Supp. of Mot. for Summ. J. ("Hanson Decl.") (Dkt. No. 72); Decl. of Bruce Tucker in Supp. of Mot. for Summ. J. ("Tucker Decl.") (Dkt. No. 73); Decl. of Cory Proscia in Supp. of Mot. for Summ. J. ("Proscia Decl.") (Dkt. No. 74); Decl. of Rachel Seguin in Supp. of Mot. for Summ. J. ("Seguin Decl.") (Dkt. No. 75); Decl. of Bradley G. Wilson, Esq. in Supp. of Mot. for Summ. J. ("Wilson Decl.") (Dkt. No. 76), as well as Plaintiff's Complaint, (Compl.), his Opposition and accompanying exhibits, (Pl.'s Opp'n to Defs.' Mot. for Summ J. ("Pl.'s Opp'n") (Dkt. No. 96)), and Plaintiff's deposition transcript, (Letter from Barbara K. Hathaway, Esq. to Court, Ex. A ("Pl.'s Dep.") (Dkt. No. 100)), and are recounted in the light most favorable to Plaintiff, the non-movant.  *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).[2] The facts as described below are not in dispute, except where indicated.

---

[2] Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The nonmoving party, in turn, must submit "a

## 1.  The January 13, 2013 Assault

Plaintiff asserts that on January 13, 2013, he was working in the pantry at Sullivan

Correctional Facility ("Sullivan") serving inmates food.  (Compl. ¶ 20; Pl.'s Dep. 9.)  Plaintiff

alerted Burns, who then alerted Hulse, of a food shortage during the evening meal.  (Pl.'s Dep. 9;

---

correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  Local Civ. R. 56.1(b).  "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (italics omitted), and "[a] nonmoving party's failure to respond to a Rule 56.1 statement permits the [C]ourt to conclude that the facts asserted in the statement are uncontested and admissible," *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009); *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 553 n.3 (S.D.N.Y. 2012) (same). Here, Defendants filed and served their statement pursuant to Rule 56.1, (Defs.' 56.1), and filed and served a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Notice to Pro Se Litigant (Dkt. No. 77)).  Despite this notice, Plaintiff failed to submit a response to Defendants' 56.1 Statement of Facts. Accordingly, the Court may conclude that the facts in Defendants' 56.1 Statement are uncontested and admissible.  *See Brandever*, 2014 WL 1053774, at *3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at *7 (S.D.N.Y. Aug. 29, 2013) (same).
     Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988), the Court will "in its discretion opt to conduct an assiduous review of the record," including Plaintiff's deposition testimony, when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1 statement."); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at *1 (S.D.N.Y. June 14, 2013) (italics omitted) ("[W]here a pro se plaintiff fails to submit a proper . . . Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (italics and internal quotation marks omitted)); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at *2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response).

Compl. ¶¶ 21–23.)  Hulse allegedly told Plaintiff "I don't give a shit," (Compl. ¶ 24), and

Plaintiff replied "that's fucked up," (*id*. ¶ 25).  Hulse, however, "thought that [Plaintiff] said fuck

him," which caused a verbal altercation between the two.  (Pl.'s Dep. 9.)  Plaintiff was then

instructed to "lock into his cell," but Hulse blocked Plaintiff from doing so.  (*Id.*)  Hulse told

Plaintiff to hit him and that he "need[ed] a vacation," and Plaintiff asked if he could move out of

the way.  (*Id.*)  Hulse spit on and punched Plaintiff and then Hulse and Burns threw Plaintiff to

the ground, and Plaintiff ended up on top of Hulse and Burns landed on top of Plaintiff.  (Pl.'s

Dep. 10; Compl. ¶¶ 30–31.)  Both continued to punch and poke Plaintiff in the eye.  (Pl.'s Dep.

10; Compl. ¶ 30.)

A response team arrived, consisting of Estabrook and Tucker, who also allegedly

assaulted Plaintiff.  (Compl. ¶ 32; Pl.'s Dep. 12.)  Plaintiff alleges he was placed in mechanical

restraints and Hulse grabbed Plaintiff by his hair and "starting banging [his] head against the

ground."  (Pl.'s Dep. 10.)  The attack continued, despite Plaintiff being in mechanical restraints.

(Pl.'s Opp'n ¶ 3.)  Plaintiff further contends that as he was being escorted out of his housing unit,

Estabrook and Tucker "bang[ed] . . . [P]laintiff['s] head against the gate and choked [him]."

(Compl. ¶ 34; Pl.'s Dep. 10.)  However, "the other officers said there w[ere] cameras in the

hallways" and to "stop hitting [Plaintiff] until [they] g[o]t to the dry cell area."  (Pl.'s Dep. 11.)

After Plaintiff was escorted to the dry cell area the "attacks started again."  (*Id.*)  One of the

Defendants allegedly "thr[ew] [Plaintiff] to the floor and hit [him] with a nite [sic] stick/baton."

(Compl. ¶ 37; Pl.'s Dep. 11.)  Plaintiff alleges that Estabrook stated "I will kill you nigger,"

(Compl. ¶ 37), and "put the nightstick . . . between [the] crack of [his] ass" and threatened to

"shove it in until it came out of [his] mouth," (Pl.'s Dep. 11; *see also id.* at 8 ("I had a nightstick

placed between my . . . buttocks . . . and said it would be shoved in there if I didn't stop

screaming until it came out of my mouth."). Cole came in, and Plaintiff asked him to "take it easy on [him];" however, Cole stepped out and Plaintiff was beat again. (Pl.'s Dep. 11.)[3]

Following the incident, Plaintiff was ordered to strip down to his boxers so that Hanson could take photos of his injuries. (Compl. ¶ 39; Pl.'s Opp'n ¶ 7.) Hanson was not present during the use of force incident. (Defs.' 56.1 ¶ 11; *see also* Pl.'s Dep. 40.) According to Plaintiff, Cole allegedly told Hanson that "we can't let the superintendent see this," (Pl.'s Opp'n ¶ 7), and not to "show the close up . . . [w]e can't let that register," (Pl.'s Dep. 11–12), so Hanson "made sure that out of all photos the close up facial photo didn't register," (Pl.'s Opp'n ¶ 7; Pl.'s Dep. 40 (testifying that Hanson made the first picture "not register[] intentionally after being instructed by Sergeant Cole").) According to Hanson, "one photograph was cut off because of a software glitch. This was unintentional, and [he] do[es] not even know if it is possible to intentionally create such a glitch. In any event, [he] did not do so." (Hanson Decl. ¶ 7; *see also id.* ¶ 9 ("The failure to register the close-up photographs was a software glitch. There was no conspiracy to cover up any of [Plaintiff's] injuries, as demonstrated by the other pictures and by the immediate attempts to rectify the situation after the glitch was discovered. [Hanson] never conspired with the other officers to cover up anything.").) Two or three days later, Officer Roser re-took the photos, (Pl.'s Opp'n ¶ 7), and they "revealed that [Plaintiff] had more injuries" than previously documented, (Pl.'s Dep. 12).[4]

---

[3] Plaintiff testified at his deposition that Cole "didn't lay a hand on [him]" but that he saw the attack and "did nothing to prevent it." (Pl.'s Dep. 40.) Additionally, "[Cole] knew of the possible initial attack that was going to take place and he still did nothing to stop it." (*Id.*)

[4] As a result of the injuries sustained in the incident, Hulse went on medical leave until at least June 30, 2013. (Defs.' 56.1 ¶ 9.)

2.  Plaintiff's Grievances

On or about January 13, 2013, Plaintiff "wrote to the superintendent and . . . wrote numerous grievances all to no avail." (Pl.'s Opp'n ¶ 3; *see also id.* ¶ 5 (stating "[P]laintiff wrote a grievance multiple times").) In total, Plaintiff wrote around three or four grievances. (Pl.'s Dep. 33; *see also id.* at 34 (testifying he couldn't remember exactly how many he wrote, but it was somewhere between three and six).) At the time, Plaintiff was housed in the Special Housing Unit ("SHU"), and in accordance with prison procedures for filing grievances in SHU, Plaintiff gave his grievances to a corrections officer in SHU to be turned in and filed. (Pl.'s Opp'n ¶ 5; *see* also Pl.'s Dep. 34 (testifying that Plaintiff "can't go to the grievance department . . . It's in the officers' hands to do that. The officers . . . are supposed to turn them in and they didn't").) However, "[o]nce Plaintiff s[aw] that they weren't being turned in," he started writing letters to other people informing them of the assault. (Pl.'s Dep. 33; *see also* Seguin Decl. Ex. B (memorandum to Plaintiff regarding letter he sent to Superintendent Griffin regarding the January 2013 incident).) Between January and March 2013, Plaintiff also wrote the Inspector General; the Superintendent; the Commissioner of Corrections; the Department of Justice; the FBI; the New York State Trooper barracks at Liberty, New York; Senator Kirsten Gillibrand; and unnamed lawyers. (Pl.'s Dep. 33–34.)[5]

Plaintiff was transferred from Sullivan to Upstate Correctional Facility on February 24, 2013. (Defs.' 56.1 ¶ 14.) After numerous other transfers, (Pl.'s Dep. 36), Plaintiff was then transferred to Auburn Correctional Facility in 2014, and, having never received a response to the

---

[5] In response to his letter to the Inspector General, Plaintiff was interviewed by "Investigator Smith." (Pl.'s Opp'n ¶ 6; Pl.'s Dep. 33.) However, "instead of punishing the officers . . . [P]laintiff was charged in Sullivan County Court with assault." (Pl.'s Opp'n ¶ 5; *see also* Pl.'s Dep. 12.) However, following a trial, Plaintiff was found not guilty. (Pl.'s Dep. 12.)

grievances filed at Sullivan, Plaintiff filed another grievance at Auburn complaining about the fact that he received no response to the grievance filed at Sullivan. (Pl.'s Opp'n ¶ 6; Pl.'s Compl. ¶ 45; Seguin Decl. ¶ 6.) Following an investigation, Plaintiff was told there was no record of a grievance at Sullivan regarding the January 2013 incident. (Pl.'s Compl. ¶ 45; Seguin Decl. ¶ 6; Seguin Decl. Ex. B (Auburn grievance forms).) Someone at Auburn allegedly informed Plaintiff "that staff assaults are not grievable" and according to "grievance [staff] at Auburn and Directive 4040," there was no "remedy." (Pl.'s Opp'n ¶ 6.)

There is no record of a grievance concerning the January 13, 2013 incident ever being filed in Sullivan records. (Defs.' 56.1 ¶ 15; Seguin Decl. ¶ 6; Proscia Decl. ¶ 4.) And, no record of an appeal exists with the Central Office Review Committee ("CORC"). (Defs.' 56.1 ¶ 16; Seguin Decl. ¶ 6.) The only grievance on record that Plaintiff filed and appealed as of May 2016 was related to his grievance at Sullivan going unanswered. (Seguin Decl. ¶ 6.)

### 3. Retaliation

Because he wrote a grievance, Plaintiff alleges he was "retaliated against," and "officers in the SHU area deprived [him] of his normal rations of food, [his] mail was not sent out," he was delayed in receiving his property and some of his property was lost, and he was denied callouts. (Pl.'s Opp'n ¶¶ 5, 7; *see also* Pl's Dep. 8 ("I was harassed, deprived of food, a whole bunch of things."); *id.* at 28 (testifying that he received empty food trays); *id.* at 29–30 (testifying he was denied callouts, was not receiving his mail, and his property was lost).) Plaintiff also claims he was "threaten[ed] repeatedly," (Pl.'s Opp'n ¶ 7), and told to "drop the lawsuit," and that "they [were] gonna [sic] kill [him]," (Pl.'s Dep. 30). In 2017, Plaintiff's jaw was broken by someone he does not know, and he believes corrections officers "put a hit out on [him]." (Pl.'s Opp'n ¶ 7). Plaintiff believes he was transferred to other prisons as a "tactic" to get the instant

Action thrown out. (*Id.*) Plaintiff reported the retaliation, and "the Superintendent sent someone to investigate, but the [investigator] tr[i]ed to misconstrue and discredit [Plaintiff]." (*Id.*)

Defendants contend that they were not aware that Plaintiff filed a grievance, (Defs.' 56.1 ¶¶ 20–24); they had no practical ability to interfere with Plaintiff's meals or mail, (*id.* ¶¶ 25–29); and they did not arrange for or personally cause Plaintiff to be deprived of food or mail, nor did they retaliate against Plaintiff any other way, (*id.* ¶¶ 30–34).

### B. Procedural History

Plaintiff filed the Complaint on January 12, 2016. (Compl.) After receiving two extensions, (Dkt. Nos. 31, 33), Defendants filed an Answer on July 6, 2016, (Dkt. No. 34). On October 13, 2016, the Court held an initial conference; however, Plaintiff refused to come to the phone for the conference, (*see* Dkt. (entry for Oct. 13, 2016)), and the Court adopted a discovery schedule, (Dkt. No. 37).[6] On August 24, 2017, Defendants filed a pre-motion letter indicating the grounds on which they would move for summary judgment. (Letter from Bradley G. Wilson, Esq. to Court (Aug. 24, 2017) (Dkt. No. 61).) The Court held a pre-motion conference on September 8, 2017 and set a briefing schedule. (Dkt. No. 64.)

Defendants filed the instant Motion and accompanying papers on November 8, 2017. (Notice of Motion; Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 67); Defs.' 56.1; Burns Decl.; Cole Decl.; Estabrook Decl.; Hanson Decl.; Tucker Decl.; Proscia Decl.; Seguin Decl.; Wilson Decl.) Plaintiff did not oppose the Motion by the January 5,

---

[6] On October 21, 2016, Plaintiff's first Application for Appointment of Counsel was docketed. (*See* Application for Appointment of Counsel (Dkt. No. 38).) In an Order dated November 4, 2016, the Court denied the request without prejudice. (Dkt. No. 39.) On October 16, 2017, Plaintiff's second Application for Appointment of Counsel was docketed. (*See* Second Application for Appointment of Counsel (Dkt. No. 65).) On February 6, 2018, the Court denied the second request without prejudice. (Dkt. No. 83.) Plaintiff again requested counsel on February 12, 2018, (Dkt. No. 87), which the Court again denied without prejudice, (Dkt. No. 88).

2018 deadline, and on January 17, 2018, counsel for Defendants wrote to the Court requesting the Motion be deemed fully submitted. (Dkt. No. 79.) The Court granted the request. (Dkt. No. 80.) In a letter dated January 14, 2018, Plaintiff wrote to the Court requesting an extension of time to respond to the Motion because he was in the hospital with a broken jaw, (Dkt. No. 81), which Defendants opposed, (Dkt. No. 82). The Court granted Plaintiff an extension until March 8, 2018. (Dkt. No. 83.) In a letter dated February 4, 2018, Plaintiff wrote to the Court requesting another extension, (Dkt. No. 87), and the Court granted Plaintiff an extension until March 20, 2018, (Dkt. No. 88). Plaintiff missed the March 20, 2018 deadline, and at Defendants' request, (Dkt. No. 89), the Court deemed the Motion fully submitted, (Dkt. No. 91). On April 20, 2018, Plaintiff filed an Opposition to the Motion, (Pl.'s Opp'n), and a letter explaining that he was transferred to other facilities and hindered from sending the Opposition, (Dkt. No. 93). Defendants requested the Court decline to consider the untimely Opposition or, in the alternative, to grant Defendants an extension to reply. (Dkt. No. 97.) The Court granted the extension request. (Dkt. No. 98.) On May 11, 2018, Defendants filed their reply. (Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt. No. 99).)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653

F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry*, 137 F. Supp. at 521 (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for

summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on [declarations] . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham,* 848 F.2d at 344, and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006) (italics and internal quotation marks omitted). And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vermont Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an

entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston*, 27 F. Supp. 3d at 351 (alterations, italics, and internal quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

## B. Analysis

Defendants move for summary judgment as to all claims on the ground that Plaintiff has failed to exhaust his administrative remedies. Additionally, Defendants seek dismissal on the merits only of Plaintiff's (1) First Amendment retaliation claims against all Defendants and (2) all claims against Hanson. The Court will address each of these arguments in turn.

### 1. Exhaustion of Administrative Remedies

As an initial matter, Defendants move for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e *et seq*. (Defs.' Mem. 4–7.)

#### a. Administrative Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all personal incidents while in prison, *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (per curiam) (same), and includes

actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates "'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' . . . [which] entails . . . 'completing the administrative review process in accordance with the applicable procedural rules.'" *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (alteration and citations omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").

As a general matter, the New York State Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Program ("IGP") outlines the procedures that apply to grievances filed by inmates in New York State correctional facilities. The IGP provides for a three-step grievance process. *See* 7 N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") § 701 *et seq.*; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c))). Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence. *See* 7 N.Y.C.R.R. § 701.5(a)(1). That complaint must provide a specific description of the problem. *See id.* § 701.5(a)(2). The second step in the tripartite framework is for the grievant or any direct party to appeal the Inmate Grievance Resolution Committee's ("IGRC") decision to the prison superintendent within seven calendar days after receipt of the written response, although the appealing party can seek an exception to the time limit. *See id.*

§ 701.5(c)(1). The third and final step is to appeal the superintendent's decision to the CORC, which the prisoner must do within seven days of the superintendent's written response to the grievance. *See id.* § 701.5(d)(1)(i). Here, too, an inmate may request an exception to the time limit. *See id.* "[O]nly after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008).

Grievances claiming employee harassment "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent. 7 N.Y.C.R.R. § 701.8.[7] Although an inmate must still follow the procedures identified above and contained in 7 N.Y.C.R.R. § 701.5(a), the regulations also provide that "[a]n inmate who feels that he/she has been the victim of harassment should report such occurrences to the immediate supervisor of that employee," although "this is not a prerequisite for filing a grievance with the IGP." *Id.* § 701.9(a). Additionally, the framework provides that "[a]ll documents submitted with [a grievance alleging harassment] must be forwarded to the superintendent by close of business that day," *id.* § 701.8(b), and that the superintendent personally or through a designee "shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment as defined in [§] 701.2," *id.* § 701.8(c), which defines "[h]arassment grievances" as "those grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate," *id.* § 701.2(e). If it is not, the grievance is returned to the IGRC for normal processing. *Id.* § 701.8(c). If it is a bona fide harassment issue, however, the superintendent must then (1)

_____

[7] Section 701.8 has been found applicable to claims of excessive force. *See, e.g.*, *Torres v. Carry*, 691 F. Supp. 2d 366, 369–70 (S.D.N.Y. 2009).

initiate an in-house investigation into the allegations by higher-ranking supervisory personnel, (2) request an investigation by the inspector general's office, or (3) if the superintendent determines that criminal activity may be involved, request an investigation by the New York State Police, Bureau of Criminal Investigation. *Id.* § 701.8(d). The superintendent then must render a decision within 25 calendar days of receipt of the grievance, *id.* § 701.8(f), and, if she does not, the grievant may appeal to the CORC, *id.* § 701.8(g). When a grievant wishes to appeal the superintendent's response to the CORC, the grievant must do so within seven days of the receipt of that response. *Id.* § 701.8(h).

A plaintiff must exhaust his administrative remedies *before* filing his initial complaint in federal court. Indeed, "[w]hen a prisoner does not properly exhaust his administrative remedies before filing suit, the action *must* be dismissed." *Mateo v. Alexander*, No. 08-CV-8797, 2010 WL 431718, at *3 (S.D.N.Y. Feb. 9, 2010); *see also Harris v. Gunsett*, No. 12-CV-3578, 2013 WL 3816590, at *6 (S.D.N.Y. July 22, 2013) (same). "This is so even if the claim has since been exhausted." *Mateo v. Ercole*, No. 08-CV-10450, 2010 WL 3629520, at *3 (S.D.N.Y. Sept. 17, 2010). Defendants bear the burden of proving that Plaintiff failed to exhaust available administrative remedies. *See Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) ("Because failure to exhaust is an affirmative defense, defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." (alteration, citations, and internal quotation marks omitted)); *see also Powell v. Schriro*, No. 14-CV-6207, 2015 WL 7017516, at *6 (S.D.N.Y. Nov. 12, 2015) (same).

Here, it is undisputed that Plaintiff did not complete the requisite three-step grievance process before filing his lawsuit related to the January 2013 incident, and thus failed to exhaust

his administrative remedies.  (Proscia Decl. ¶ 4; Seguin Decl. ¶ 5.)

<u>b.  Availability of Administrative Remedies</u>

Failure to exhaust a technically available administrative remedy, however, does not end the inquiry.  The PLRA "contains its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016).  The Supreme Court recently explained in *Ross*:

> Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.  And that limitation on an inmate's duty to exhaust . . . has real content. . . .  [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

*Id.* at 1858–59 (quoting *Booth*, 532 U.S. at 738).

There are at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief."  *Id.* at 1859; *see also Williams v. Priatno*, 829 F.3d 118, 123–24 & n.2 (2d Cir. 2016) (applying *Ross* but noting that "the three circumstances discussed in *Ross* do not appear to be exhaustive").[8]  First, an "administrative procedure is unavailable when . . . it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Ross*, 136 S. Ct. at 1859 (citing *Booth*, 532 U.S. at 736, 738).  Second, a remedy is unavailable where "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  *Id.*  Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through

---

[8] Because, as in *Williams*, the circumstances delineated in *Ross* are also relevant to the facts of this case, the Court "do[es] not opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use."  *Williams*, 829 F.3d at 123 n.2.

machination, misrepresentation, or intimidation." *Id.* at 1860. These three circumstances "do not appear to be exhaustive," *Williams*, 829 F.3d at 123 n.2, but they do "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

Shortly after *Ross*, the Second Circuit applied the *Ross* availability analysis in *Williams*. 829 F.3d 118. The question of availability addressed by the court in *Williams* governs this case as well. In *Williams*, the plaintiff alleged he was beaten by two correction officers. *Id.* at 120. On January 15, 2015, Williams claimed to have drafted a grievance while he was in SHU, and gave it to a corrections officer to forward to the grievance office as required by the grievance procedures that applied to inmates in SHU. *Id.* at 120–21. A week later, Williams asked the superintendent why he had not received a response and was told she knew nothing about it and would look into it. *Id.* at 121. Several days later, Williams was transferred to another facility. *Id.* He never received a response to his grievance and claimed that the correction officer never filed it for him. *Id.* He never appealed the grievance but commenced a § 1983 action, and the defendants moved to dismiss on the basis that Williams failed to exhaust his administrative remedies. *Id.* Accepting as true the allegation that the corrections officer never filed Williams' grievance, the *Williams* court determined that the governing regulations only contemplated appeals of grievances that are actually filed; the regulations did not specify a process to appeal or otherwise exhaust when a grievance by a prisoner housed in SHU is given to a corrections officer to file as per the specified procedure, but the officer fails to file it. *Id.* at 124. As "the regulations give no guidance whatsoever to an inmate whose grievance was never filed," the Second Circuit concluded that the regulations were "'so opaque' and 'so confusing that . . . no reasonable prisoner can use [them].'" *Id.* (quoting *Ross*, 136 S. Ct. at 1859.); *id.* at 126 (finding "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no

inmate could actually make use of it").  In so concluding, the Second Circuit noted that the fact

that the inmate in *Williams* was transferred between facilities approximately two weeks after

handing off his grievance made the procedure even more obscure.  *See id.* at 126. "At the heart

of the Second Circuit's analysis was the inescapable quandary that inmates find themselves in

when their grievances are not filed—namely, that current regulations do not guarantee recourse

for an inmate whose grievance was never filed."  *McRae v. Cordero*, No. 15-CV-4334, 2018 WL

3611964, at *6 (S.D.N.Y. July 26, 2018)

The Court in *Williams* analyzed the same regulations as the instant case.  829 F.3d at

125– 26 (citing 7 N.Y.C.R.R. §§ 701.5, 701.6, 701.8).  As in *Williams*, Plaintiff here has

similarly alleged that he gave his grievance to an officer while housed in SHU, and his grievance

was never filed.  (Pl.'s Dep. 26 (testifying "[m]y grievance was never turned in" and "[t]hey

were never even submitted"); *id.* at 33 (testifying his grievances "weren't being turned in"); *id.* at

34 (testifying the officers were "supposed to turn [the grievances] in and they didn't"); Pl.'s

Opp'n ¶ 5 (stating that Plaintiff "gave [the grievances] to the officers in the SHU area to be

turned in and filed"); *id.* ¶ 7 (stating that an exception to exhaustion should apply because "the

officer's [sic] are not filing [the grievances]").)  Like the Plaintiff in *Williams*, Plaintiff was

transferred from Sullivan to Upstate about a month and a half after allegedly filing his grievance.

(Defs.' 56.1 ¶ 14 (stating Plaintiff was transferred from Sullivan to Upstate on February 24,

2013).)[9]  Plaintiff also argues that "Directive 4040 is confusing and [there] isn't any procedure[]

in place . . . that explains how to report when these types of misdeeds on behalf of staff happens

---

[9] It bears noting that the transfer was not itself determinative in *Williams*.  The Court specifically noted that "if the regulations . . . were not already so confusing that no ordinary prisoner can discern or navigate them, their obscurity was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer."  *Id.* at 126 (alteration, citation, and internal quotation marks omitted).

if an officer throws your grievance in the trash." (Pl.'s Opp'n ¶ 7.)[10]  The Court agrees.  Plaintiff

was faced with the same "opaque" and "confusing" set of regulations the *Williams* court found

"incapable of use." *Williams*, 829 F.3d at 126 (internal quotation marks omitted).[11]  However,

because the Motion before the Court is one for summary judgment, unlike in *Williams*, the Court

need not accept as true the allegation that the corrections officer never filed Plaintiff's grievance.

*See id.* at 124 (accepting as true the allegation that the correction officer never filed the

plaintiff's grievance).  Thus, the Court must determine whether the record adequately supports

Plaintiff's contention that the corrections officer never filed Plaintiff's grievances.

   The Second Circuit has not yet provided published guidance regarding what record

evidence is sufficient to find a genuine issue of material fact as to whether the grievance process

was "available" under the *Ross* and *Williams* exhaustion analysis.  However, in a recent

unpublished opinion, the Second Circuit considered alleged actions that "b[ore] a strong

similarity to those of the defendants in *Williams*." *Medina v. Napoli*, 725 F. App'x. 51, 53 (2d

Cir. 2018)).  The plaintiff, Medina, like Williams, was an inmate in SHU who was required to

rely on correction officers to file his grievances, and "both Medina and Williams alleged that

those officers intentionally discarded the grievances or prevented them from being filed." *Id.* at

53–54.  The Second Circuit concluded that "[t]he record establishes that Medina's allegations,

supported by witness testimony, about defendants' actions to prevent the filing of Medina's

---

[10] DOCCS Directive 4040 is the document given to inmates that outlines the DOCCS inmate grievance regulations.  (Defs.' Reply Mem. 2.)

[11] Although the Second Circuit in *Williams* addressed a motion to dismiss, the legal analysis for determining whether an exception to exhaustion applies is the same for a summary judgment motion.  *McRae*, 2018 WL 3611964, at *5 n.7 (noting "that '[the fact] that Williams was decided on a motion to dismiss and not on a summary judgment motion does not change the analysis.'" (quoting *Medina v. Napoli*, 725 F. App'x. 51, 54 (2d Cir. 2018)).

grievances concerning the June 2007 incident are sufficient, when viewed in the light most favorable to Medina, to raise a genuine issue of material fact as to whether the grievance process was 'available' to Medina." *Id.* at 54.  Although not in the context of a summary judgment motion, the Second Circuit in *Williams* considered the claim plausible that the correction officer never filed his grievance "given Williams's allegations that he asked superintendent Perez about his grievance one week after giving it to the correction officer and Perez said that she had no knowledge of it."  829 F.3d at 124 & n.3.  Because it was a harassment grievance, had it been filed, it should have been forwarded to Perez the same day.  *Id.* at 124 n.3.  Thus, "[a]t the motion to dismiss stage, the allegation that she had no knowledge of the grievance support[ed] Williams's allegation that it was not filed."  *Id.*  In contrast, in *Hicks v. Adams*, 692 F. App'x 647 (2d Cir. 2017), the Second Circuit found the allegation "that prison staff did not transmit appeals [the plaintiff] attempted to submit" insufficient to plausibly allege that prison officials thwarted his attempt to appeal, because "he d[id] not state when he submitted the appeals, to whom, and what, if any, steps he took after the documents were not filed."  *Id.* at 648.

Here, Plaintiff has consistently alleged in his Complaint, (Compl. ¶¶ 17, 42, 48), deposition testimony, (Pl.'s Dep. 26, 33–34), and Opposition to the Motion, (Pl.'s Opp'n ¶¶ 3, 5, 7), that around January 13, 2018, he wrote at least three grievances, and, as required by regulations for an inmate in SHU, gave those grievances to officers to file for him.  Plaintiff testified that he kept a copy of the grievance; however, his property was either destroyed or taken by a corrections officer.  (Pl.'s Dep. 32, 35.)  After changing facilities multiple times, (Pl.'s Dep. 36), on February 7, 2014, Plaintiff filed another grievance regarding the unanswered grievances he had filed at Sullivan, (Compl. ¶ 17; Pl.'s Opp'n ¶ 6).  Furthermore, deposition testimony, as well as the subsequent grievance from Auburn regarding the unanswered grievance from

Sullivan, also work to create a genuine dispute of material fact regarding whether Plaintiff attempted to filed a timely grievance at Sullivan in January 2013. Viewing these facts in the light most favorable to Plaintiff, the Court finds the record evidence sufficient to raise a genuine issue of material fact as to whether the grievance process was "available" to Plaintiff. Although there is no witness testimony other than Plaintiff's to support the allegation, *Medina*, 725 F. App'x at 54 (finding additional witness testimony sufficient to create genuine dispute of material fact), the evidence in the record contains sufficient detail regarding when and how Plaintiff attempted to file his grievances. This holding is in accord with numerous other district courts in the Second Circuit that have denied summary judgment based on similar record evidence. *See, e.g.*, *Jackson v. Downstate Corr. Facility*, No. 16-CV-0267, 2018 WL 3650136, at *8 (S.D.N.Y. July 31, 2018) (finding "[the] [d]efendants' argument that [the] [p]laintiff never actually filed his grievance . . . of no moment," because the plaintiff's deposition "demonstrates that [the] [p]laintiff made attempts to file a grievance in October of 2015, though there is no record of such a grievance with the IGRC"); *McRae*, 2018 WL 3611964, at *6 (finding the plaintiff's deposition testimony, and a subsequent grievance concerning the superintendent's non-response to his grievance, sufficient to create a material dispute of fact regarding whether the plaintiff had filed a grievance); *Trahan v. Capozzola*, No. 12-CV-4353, 2017 WL 9512406, at *5–6 (E.D.N.Y. June 26, 2017) (denying summary judgment for two claims based on sworn testimony that the plaintiff filed his grievance by giving it to a corrections officer, but granting summary judgment for the one claim where the plaintiff did "not state when he filed the grievance and otherwise proffer[ed] no details regarding its submission"), *adopted by* 2017 WL 4286620 (E.D.N.Y. Sept. 27, 2017); *Carter v. Revine*, No. 14-CV-1553, 2017 WL 2111594, at *12 (D. Conn. May 15, 2017) (finding the plaintiff's affidavit that he submitted to two named individuals, and "other

available employees," six medical requests and a "written grievance in reference to the lack of response to [his] requests for medical care . . . sufficient evidence for the [c]ourt to conclude he tried to submit the grievance by and through the assistance of correctional officers while he was housed in the [Restrictive Housing Unit]" (alterations and internal quotation marks omitted); *Reid v. Marzano*, No. 15-CV-761, 2017 WL 1040420, at *3 (N.D.N.Y. Mar. 17, 2017) (denying summary judgment based on the plaintiff's deposition testimony that his grievance was not filed); *Juarbe v. Carnegie*, No. 15-CV-1485, 2016 WL 6901277, at *4 (N.D.N.Y. Nov. 23, 2016) (concluding "questions of fact remain regarding the filing of the grievances, which precludes summary judgment," where the plaintiff alleged he filed grievances, but no record of the grievances being received or processed existed). *But see Hicks*, 692 F. App'x at 648 (approving dismissal where there was no assertion regarding when and to whom a grievance was filed, and what subsequent steps were taken after the grievance was not filed).

Defendants argue that Plaintiff has to provide "something more than the general claims made in his deposition that his grievance was thrown away," and cite to cases from the Northern District holding that the "mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations." (Defs.' Mem. 6 (quoting *Rodriguez v. Cross*, No. 15-CV-1079, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017), *adopted by* 2017 WL 2790530 (N.D.N.Y. June 27, 2017)).) However, *Rodriguez* did not involve an inmate housed in SHU who was dependent on the officers to file a grievance for him, and the court explicitly distinguished its holding granting summary judgment from those cases "den[ying] a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU," because "[i]nmates not housed in the SHU are in a different position to SHU inmates when determining if grievance

procedures are essentially unknowable or unavailable." *Rodriguez*, 2017 WL 2791063, at *7

(internal quotation marks omitted). And, as explained above, the Court agrees with the

numerous courts that have denied summary judgment based on sworn deposition testimony from

the Plaintiff creating a dispute of material fact regarding whether a Plaintiff's grievance was

submitted. *See, e.g.*, *Trahan*, 2017 WL 9512406, at *5 ("While [the] [d]efendants argue that

there is no evidence to support [the] [p]laintiff's claim that he handed timely grievances to

corrections officers, [the] [p]laintiff's position is supported by his sworn testimony, which is

sufficient to defeat summary judgment."); *Reid*, 2017 WL 1040420, at *3 (finding that the

plaintiff could rely on his deposition testimony and rejecting the defendants' argument that

"mere allegation of submitting a grievance, without supporting evidence" was insufficient to

withstand summary judgment as "it [wa]s unclear what evidence [the] [d]efendants expect[ed]

[the] [p]laintiff to produce of his grievances that were allegedly discarded by corrections

officers") (italics and internal quotation marks omitted); *see also Icangelo v. Cty. of Suffolk*, No.

16-CV-1982, 2018 WL 1867108, at *6–7 (E.D.N.Y. Feb. 8, 2018) (finding that despite

testimony from the plaintiff that was contradicted by his own deposition testimony regarding

whether he did, in fact, write a grievance, and testimony from a Correction Sergeant with the

Claim Investigation section at the jail who searched for and was unable to find the grievance, the

court nonetheless, "drawing all inferences in the light most favorable to [the plaintiff],"

concluded "the facts . . . weigh against a finding of non-exhaustion"), *adopted by* 2018 WL

1115349 (E.D.N.Y. Feb. 28, 2018).

     As such, drawing all inferences in Plaintiff's favor, there is a dispute of material fact

regarding whether Plaintiff's grievance went unfiled. Because the grievance procedures were

incapable of use, they are considered "unavailable" to Plaintiff, and Plaintiff "need not exhaust

remedies if they are not 'available.'" *Ross*, 136 S. Ct. at 1855, 1858. Accordingly, Defendants'

motion for summary judgment based upon lack of exhaustion is denied.

### 2. First Amendment Retaliation

Plaintiff also alleges First Amendment retaliation claims against Defendants, which fail

as a matter of law. (Pl.'s Dep. 26.) "To state a First Amendment retaliation claim . . . , a

plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant

took adverse action against the plaintiff, and (3) that there was a causal connection between the

protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d. Cir. 2015)

(quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d. Cir. 2009)); *see also Quezada v. Roy*, No. 14-

CV-4056, 2015 WL 5970355, at *19 (S.D.N.Y. Oct. 13, 2015) (same); *Ramrattan v. Fischer*,

No. 13-CV-6890, 2015 WL 3604242, at *12 (S.D.N.Y. June 9, 2015) (same). The Second

Circuit has made clear that courts are to "approach prisoner retaliation claims with skepticism

and particular care, because virtually any adverse action taken against a prisoner by a prison

official—even those otherwise not rising to the level of a constitutional violation—can be

characterized as a constitutionally proscribed retaliatory act." *Davis v. Goord*, 320 F.3d 346, 352

(2d Cir. 2003) (internal quotation marks omitted); *see also Dolan*, 794 F.3d at 295 (same);

*Corley v. City of New York*, No. 14-CV-3202, 2015 WL 5729985, at *8 (S.D.N.Y. Sept. 30,

2015) (same).

"It is well-established that inmates' filing of grievances is a constitutionally protected

exercise of their right under the First Amendment to petition the government for the redress of

grievances." *Mateo v. Bristow*, No. 12-CV-5052, 2013 WL 3863865, at *4 (S.D.N.Y. July 16,

2013) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)); *see also Andino v. Fischer*,

698 F. Supp. 2d 362, 382 (S.D.N.Y. 2010) (same). However, with respect to the second prong,

"[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Davis*, 320 F.3d at 353 (internal quotation marks omitted). The "ordinary firmness" inquiry is not subjective, and a prisoner may still suffer adverse action even where undeterred. *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004); *see also id.* at 384 ("[T]he fact that a particular plaintiff . . . responded to retaliation with greater than 'ordinary firmness' does not deprive him of a cause of action."); *Nelson v. McGrain*, No. 12-CV-6292, 2015 WL 7571911, at *1 (W.D.N.Y. Nov. 24, 2015) ("[A] prisoner can state a retaliation claim in the absence of actual deterrence." (quoting *Nelson v. McGrain*, 596 F. App'x 37, 38 (2d Cir. 2015))). Plaintiff alleges he was subject to two types of adverse actions: first, verbal threats, (Pl.'s Dep. 30, 35; Pl.'s Opp'n ¶ 7), and second, harassing conduct, that included serving him empty food trays, tampering with his mail, and destroying and taking his property, (Pl.'s Dep. 8, 28–30; Pl.'s Opp'n ¶¶ 5, 7). The Court addresses each in turn.

Courts have found that, while verbal threats may qualify as adverse actions, they must be "sufficiently specific and direct" to be actionable. *Mateo*, 2013 WL 3863865, at *5; *see also Quezada*, 2015 WL 5970355, at *21 ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." (internal quotation marks omitted)); *Lunney v. Brureton*, No. 04-CV-2438, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007) (noting that "verbal threats may constitute adverse action . . . depend[ing] on their specificity and the context in which they are uttered"). Plaintiff does not know the names of the officers who threatened him. (Pl.'s Dep. 35 (responding to a question about which officers threatened him with, "[h]ow am I supposed to know their names when I'm sitting in a cell, locked inside a cell. [They] [w]alk by and threaten me.").) The threats Plaintiff received

including "telling him to drop the lawsuit," (*id.* at 30), and that they were "gonna kill [him]," (*id.* at 30– 31).  The Court finds these threats to be lacking in specificity and directness.  "[S]o long as the putative threat's directness and specificity matter, it is difficult to understand how Plaintiff's claims . . . are sufficient." *Albritton v. Morris*, No. 13-CV-3708, 2016 WL 1267799, at *18 (S.D.N.Y. Mar. 30, 2016) (citation omitted) (holding statement that officer "told Plaintiff that grievances were unlikely to succeed and said that he would handle things 'his way'" was insufficiently specific or direct); *see also Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("The opacity of [the defendant's] threats to [the plaintiff]—that [the plaintiff] should 'wait till he put his hands on me,' and that 'one day he and I will party,'—softens the deterrent effect considerably." (citations omitted)); *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (granting summary judgment in favor of a defendant who told an inmate that "'me and my boys . . . going to get you' while brandishing a copy of a grievance"); *Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010) ("Neither [the defendant's] comment . . . that [the plaintiff] was 'lucky' because correction officers 'usually fuck people up for writing a bunch of bullshit grievances' nor his . . . comment that "[y]ou're not the only one who can write.  I'm willing to bet you'll break or get broke up,' was a 'direct' nor 'specific' threat." (alterations and citations omitted)), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012).  There is nothing in the record to indicate that any Defendant made a sufficiently direct or specific threat to Plaintiff to state a retaliation claim based on alleged verbal threats.

Defendants also argue that Plaintiff's other allegations of harassing conduct lack specificity, as "Plaintiff has provided minimal detail about the actual actions purportedly taken against him: no description of when they occurred, who did it, or how the Defendants were

behind it." (Defs.' Mem. 8.) The Court agrees. Plaintiff testified that "a couple of times . . . 'they' would send a tray in my cell, but then you open the top and it's only like a half a spoon of food inside the tray." (Pl.'s Dep. 27.) Plaintiff "wouldn't count" how many times this happened, because "nobody counts shit like this." (*Id.* at 28.) Also, Plaintiff speculates that he "could have 30, 40 letters sitting up in the mail room" because he "ha[s] people telling [him] that mail was written to [him] [but] [he] never received it." (*Id.* at 30.) Additionally, "property" of Plaintiff's "was lost," and he was getting items stolen from his cell by officers. (*Id.* at 30; *see also id.* at 35 (testifying he was not able to keep a copy of the grievance because his "property [wa]s being destroyed").) As is true in response to any motion for summary judgment, Plaintiff is required to provide evidence sufficient to allow a jury to find in his favor, as "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). Plaintiff's allegations regarding this harassing conduct are lacking in any specifics regarding how Defendants were involved in the alleged conduct and how frequently it occurred. Defendants provided sworn statements that they did not even know a grievance was filed, did not have the capacity to interfere with Plaintiff's food or mail, and did not arrange for or personally retaliate against Plaintiff, (Defs.' 56.1 ¶ 25–29), which Plaintiff does not contest. This fatally undercuts Plaintiff's claim. *See Mateo v. Dawn*, No. 14-CV-2620, 2016 WL 5478431, at *8 (S.D.N.Y. Sept. 28, 2016) ("Plaintiff's claim is similarly handicapped by its failure to allege or otherwise suggest that Defendants even knew of the complaints filed against other correction officers."); *Alston v. Pafumi*, No. 09-CV-1978, 2016 WL 81785, at *7 (D. Conn. Jan. 7, 2016) (granting partial summary judgment where the plaintiff identified "no record evidence from which a reasonable jury could infer that any other defendant was aware of [the plaintiff's] complaints"), *reconsideration denied*, 2016 WL 447423 (D. Conn.

Feb. 4, 2016); *Tirado v. Shutt*, No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his . . . grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named."), *adopted in relevant part by* 2015 WL 4476027 (S.D.N.Y. July 22, 2015); *Wesley v. Kalos*, No. 97-CV-1598, 1997 WL 767557, at *5 (S.D.N.Y. Dec. 11, 1997) ("To establish a claim of retaliatory transfer requires [the plaintiff], at a minimum, to assert facts to show that the [d]efendants knew of [the plaintiff's] complaints prior to the transfer.").

To the extent Plaintiff alleges that other—unnamed—officers retaliated against him based on Plaintiff's attempt to grieve the January 2013 incident, Plaintiff has not established a nexus between his protected activity and the alleged retaliation. "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." *Jones v. Fischer*, No. 10-CV-1331, 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013); *see also Henson v. Gagnon*, No. 13-CV-590, 2015 WL 9809874, at *12 (N.D.N.Y. Dec. 10, 2015) ("The record is devoid of evidence . . . that supports [the] [p]laintiff's conclusory assertion that [the defendant] planted evidence and issued the [m]isbehavior [r]eport based upon evidence in retaliation for grievances [the] [p]laintiff had filed against other corrections officers."), *adopted by* 2016 WL 204494 (N.D.N.Y. Jan. 15, 2016); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (holding that the plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Hare v. Hayden*, 09-CV-3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright*, 554 F.3d at 274 (dismissing retaliation claim against a corrections officer when only alleged

basis for retaliation was a complaint about a prior incident by another corrections officer). In this case, Plaintiff's speculation that unnamed individuals retaliated against Plaintiff based on his attempt to grieve the 2013 incident is not supported by the record. Therefore, Defendants' Motion is granted as to the First Amendment retaliation claims, and Plaintiff's retaliation claims against Defendants are dismissed.

### 3. Claims Against Hanson

Defendants argue the claims against Hanson should be dismissed, because there is no dispute that Hanson's only involvement in the alleged constitutional deprivations was taking photographs of Plaintiff after the alleged assault and Plaintiff has failed to allege a conspiracy to cover up the extent of Plaintiff's injuries. (Defs.' Mem. 9.)

A Section 1983 conspiracy claim requires "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002) (same); *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 464–65 (S.D.N.Y. 2012) (same). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (internal quotation marks omitted).[12] To state a conspiracy claim, Plaintiff "must provide

---

[12] Defendants argue that Plaintiff's conspiracy claims should be dismissed according to the "intracorporate conspiracy doctrine," which provides that employees or agents of a single corporate entity, acting within the scope of their employment, are legally incapable of conspiring together. (Defs.' Mem. 9–10.) *Hill v. City of New York*. No. 03-CV-1283, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005) (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)). Although the Second Circuit has recognized the intracorporate conspiracy doctrine in the context of § 1985, *see Herrmann*, 576 F.2d at 459; *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 72 (2d Cir. 1976), it has not yet extended the doctrine to § 1983, *see Ali v. Connick*, 136 F. Supp. 3d 270, 282 (E.D.N.Y. 2015) (collecting cases). The Court therefore declines to grants summary

some factual basis supporting a meeting of the minds." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted). Thus, Plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations and internal quotation marks omitted).

Plaintiff alleges that Defendants, including Hanson, conspired to cover up the alleged use of excessive force against him. (Pl.'s Dep. 40.) As evidence, he points to the conversation between Cole and Hanson as the photographs were being taken on January 13, 2013 immediately following the assault. According to Plaintiff, Cole told Hanson to not let the superintendent see the close up photo, and that they "can't let [the close up] register." (Pl.'s Dep. 11; Pl.'s Opp'n ¶ 7.) Further, the close-up photos did not, in fact, register. (Pl.'s Dep. 12, 40; Pl.'s Opp'n ¶ 7.) Based on this evidence, Plaintiff has created a fact dispute regarding whether there was an agreement between Cole and Hanson. "[T]his is not a case where evidence shows that the defendants merely worked together, or communicated generally with each other." *Deskovic*, 894 F. Supp. 2d at 466 (collecting cases). Further, Plaintiff has also provided "details of time and

---

judgment based on this argument. Regardless, Plaintiff's claims fit within the "personal stake" exception to the rule. "The intracorporate conspiracy doctrine does not apply to bar conspiracy claims against individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity." *Id.* at 282 (internal quotation marks omitted). Construing the facts in the light most favorable to Plaintiff, Plaintiff has alleged facts which, if true, would show that Defendants acted in their own interests and outside the normal course of their duties for DOCCS if they did indeed attempt to cover up the use of force against Plaintiff. "This is consistent with cases from th[e] [Second] [C]ircuit in which district courts have found that the personal stake exception applied when police officers were alleged to have: covered up the use of excessive force, engaged in race-based false arrests to improve their chances of promotions and benefits, and assaulted a prisoner in retaliation for his participation in a federal lawsuit." *Id.* (collecting cases) (citations omitted).

place and the alleged effects of the conspiracy," *Warren*, 33 F. Supp. 2d at 177 (internal

quotation marks omitted), as well as "overt acts which [D]efendants engaged in which were

reasonably related to the promotion of the alleged conspiracy," *Mitchell v. Cty. of Nassau*, 786 F.

Supp. 2d 545, 565 (E.D.N.Y. 2011) (internal quotation marks omitted). *See also Hill v. City of

New York*, No. 03-CV-1283, 2005 WL 3591719, at *5 (E.D.N.Y. Dec. 30, 2005) ("Given that a

jury may rationally infer that the defendant officers participated in a conspiracy to cover-up

unconstitutional acts, summary judgment is not appropriate on [the] plaintiff's conspiracy

claim."). And, the fact that the close-up photo was, in fact, unable to be recovered serves as

circumstantial evidence in further support of the conspiracy. *See DeMeo v. Kean*, 754 F. Supp.

2d 435, 447 (N.D.N.Y. 2010) (finding that erased and destroyed video recordings in control of

defendants was "sufficient circumstantial evidence to permit a jury to determine whether [the

defendants] conspired . . . to partially erase and/or destroy the video evidence."). Thus, the Court

denies Defendants' motion for summary judgment as to the claims again Hanson.

### III. Conclusion

For the foregoing reasons, the Motion for Summary Judgment is granted as to the First

Amendment retaliation claim, and denied as to the rest of Plaintiff's Claims. The Court will hold

a conference on November 8, 2018 at 10:30 a.m. to discuss the status of the remaining claims.

The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 66), and

mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated:     September 28, 2018
           White Plains, New York

                                        KENNETH M. KARAS
                                        United States District Judge

31